Comstock, J.
At the last December term we affirmed the decision of the Superior Court of the city of Hew York, awarding a new trial in this cause, and we gave final judgment against the plaintiff, pursuant to the stipulation into which he entered on bringing the appeal. The case was important in the sum of money involved, and the evidence, both oral and documentary, was voluminous. The conclusions of fact found at the trial were, in some material respects, indistinctly stated, inducing a necessity of examining the case at large in order to arrive at correct results. Influenced by these considerations, we allowed the remittitur to be stayed after the' decision in December, in order to afford the appellant an opportunity of moving for a reargument. That motion has been made, and the case has now been reexamined with the attention it deserves.
*211 In the first place it will be proper to consider the nature and scope of an appeal to this court, where, as in this case, the order appealed from reverses the judgment rendered at the trial, and awards a new trial. In such cases, it is made, by-statute, a condition of the right of appeal, that the appellant shall enter into a written stipulation that judgment absolute be rendered against him, provided the order granting the new trial shall be affirmed; and it is declared to be the duty of this court to pronounce such final judgment, if no error is found in the decision. (Code of Procedure, § 11.) The general policy of this statute is well understood. In very many litigations there is no dispute about the facts on which the rights of the parties depend. In such cases a reversal in the subordinate court of the judgment given at the trial, and an award of a new trial, will, in substance and effect, determine the whole controversy, so far as that court is concerned, and the expense and delay of another trial and appeal, before the decision of this court can be had on the questions of law involved, would seem to be entirely useless. The Legislature, therefore, deemed it expedient to allow a direct appeal to this court, in order to avoid such delay and expense, annexing, however, as a condition, that the party against whom the reversal has been pronounced, shall waive a new trial in case his appeal shall be determined against him, and consent td a final judgment. Before talcing such an appeal, therefore, he necessarily determines for himself that no further or better conclusions of fact can be found in his favor, and that on a new trial judgment must be given against him.
In the present case the reversal of the plaintiff’s judgment and the award of a new trial, were based, in part, at least, upon views of the testimony and conclusions of fact somewhat different from those entertained by Mr. Justice Hoffman, and embraced in the Case made at the trial before him. The Superior Court had undoubted power and right to examine the evidence at large, and upon the whole case, including the law and the facts, to set aside the judgment. The power and the duty of this court are more limited. We are simply *212 to determine whether any error was committed by the court below in ordering a new trial. Questions of fact are not before us. In appeals of this kind, if the judgment rendered at the trial has been reversed upon conclusions of fact different from those found by the jury, the judge or the referee, we must, I think, examine the case at large far enough to be satisfied that those conclusions are not entirely unsupported by any evidence. If, on such examination, a question of fact appears, we cannot review the determination of that question, made by the cogrt below in reversing the judgment, although such determination is opposed to the verdict of the jury or the finding of the judge. The distinction is, that the subordinate courts, in reviewing trials, have the power of passing upon questions of fact as well as law, while the office of this court is to correct errors of law only. It necessarily results that a party who appeals from an order granting a new trial, and stipulates for final judgment in case the order be affirmed, concedes to his adversary every conclusion of fact which is supported, however slightly, by the evidence. If he is unwilling to make such a concession, and to rest his appeal wholly upon the law of the case, then he should be advised, instead of appealing, to acquiesce in the reversal of his judgment, and to go down to another trial.
In the case before us having come to a conclusion that a reargument ought not to to be granted, I proceed to indicate the grounds on which we think that the judgment already pronounced is correct. We should have been quite content if the case had gone to a second trial, according to the decision of the court below. But we had no power to give it that direction. Either the plaintiff was entitled to a reversal of that decision and an affirmance of the judgment which he recovered at the trial, or the defendant, on the stipulation which he entered into on bringing his appeal, was entitled to a final judgment against him. Between these alternatives there was no middle course.
The precise point in controversy is, whether the plaintiff or one Abraham G. Thompson became entitled to a bond and *213 mortgage of $60,000, executed in November, 1839, by the Long Island Railroad Company, a corporation chartered by this State, to the Morris Canal and Banking Company. The last mentioned company was a New Jersey corporation, and held and owned this security until December 9, 1840, when an assignment of it was made to the State of Michigan. Tnompson claimed title and acquired possession of the security under this transfer, having purchased it at auction from the agent of Michigan, in May, 1843. The plaintiff claims under a transfer, junior in point of time, made to one Sanxay his immediate assignor, by the receivers of the Morris Canal and Banking Company, on the 13th of November, 1845. Those receivers were appointed in January, 1842, by the Court of Chancery of the State of New Jersey, in a suit instituted against the Company in August, 1841, by Richards and Selden, who were its judgment creditors. If the plaintiff can impeach the prior transfer to the State of Michigan and the title which the plaintiff derived from that State, no doubt exists in regard to the validity of his own title. The validity of that assignment to Michigan is denied by the plaintiff on two grounds: First, that it was made by the executive officers of the company without the authority of the board of directors, in other words, that it was not the act of the corporation, and for that reason was utterly void. Second, on the ground that it was voidable as to creditors, under an act of the Legislature of New Jersey, passed February 16,1829, “ To prevent frauds by incorporated companies.” These two grounds of objection have no dependence on each other, and they will, therefore, be separately considered.
First. The Morris Canal and Banking Company was authorized by its charter, granted in 1824, to construct a canal in the State of New Jersey, and also to carry on. the business of banking; to buy and sell bills of exchange; to deal in public and corporate stocks; to loan money on bond and mortgage; to receive money or property in trust and to execute trusts. Its capital stock, for the purpose of building the canal, was fixed at $1,000,000, and $1,000,000 more could be added for *214 the purposes of banking. The number of directors, originally fifteen, was increased by a supplementary act to twenty-three, and it was declared that “the corporate powers of the company should be exercised by the board.” Authority was given to establish such by-laws, ordinances and regulations as should be deemed necessary or convenient for the transaction of its business. A code of by-laws was adopted, one of which provided for stated meetings of the directors, in each week, and declared that five directors, including the president, should form a quorum for the transaction of the ordinary business of the company. In the intervals between the stated meetings of the directors, the business and affairs of the company were to be managed by the standing and special Committees, which were to report their proceedings for the approbation of the board. The same by-laws set forth certain acts which could not be done without the concurrence of a majority of all the directors, such as the election of officers and the filling of vacancies in the board.
We come now to the transaction between the company and the State of Michigan, examining, in this connection, only the question whether the transfer to that State of the bond and mortgage in controversy is to be regarded as made by the authority of the corporation. In the course of its dealings the company became largely indebted to Michigan, and in the year 1840, the State was pressing for payment; the amount due then being about $800,000. The negotiations, which were carried on for a considerable time, resulted in an agreement, dated December 9,1840, professing to be between the company of the one part, and the State of Michigan of the other, whereby certain securities held by the company were to be delivered over to the State, and the debt was to be paid by installments, extending through a period of some ten or twelve years. The State, on its part, agreed to receive the debt in those installments, and to extend the time accordingly, provided the payments were made pursuant to the stipulation. The securities mentioned in the agreement consisted of various bonds, mortgages, stocks and bills receivable, amounting nominally to between $500,000 *215 and $600,000; and among them was the bond and mortgage of the Long Island Eailroad Company, which is the subject of the present controversy. The agreement was under the corporate seal of the company, and was signed on its behalf by its president and cashier. It was carried into effect by an actual transfer and delivery of the securities specified. On the part of the plaintiff it is insisted that the agreement and transfer were wholly inoperative and void, on the ground that they were never formally authorized by the board of directors. It appears, however, from the recorded proceedings of the board, that at a meeting held on the 5th of November, 1840, there being present a quorum of five members, in accordance with the by-law above mentioned, the negotiations with Michigan were mentioned by the president as being nearly completed; and it also appears that at a meeting held on the Slst of December, 1840, the same quorum being present, including the president, a formal resolution was adopted, approving of the said agreement entered into on the 9th of the same month, and directing the executive officers of the company to comply, in all respects, with the provisions thereof. The company, at the time of this transaction, was embarrassed in its affairs, but it kept its office open and continued to transact business until September, 1841, when it went into open insolvency. During the period of its existence remaining after these arrangements were made with Michigan, no objection thereto appears to have been made on the part of the company. On the contrary, there seems to have been entire acquiescence, and the company received the advantages resulting from an extension of a very large debt, which had been pressed with great earnestness, and which it had no present means of paying.
The first inquiry suggested by the facts stated is, whether the by-law of the company authorizing a quorum of five directors, including the president, to transact ordinary business, was a valid negotiation. We are clearly of opinion that it was. The charter of the company, it is true, declared that its powers should be exercised by a board of twenty-three direc *216 tors, and it may well be conceded that in the absence of any different regulation, a majority of the whole number would be necessary to constitute a legal quorum for the transaction of any business whatever. But it would be a very extraordinary construction of the charter in this respect, to hold that the board of twenty-three directors, or a majority thereof, must meet and act whenever any corporate power was to be exercised, and that no delegation of authority could be made to subordinate agents, to committees, or to a quorum consisting of a smaller number. The board of directors of a corporation do not stand in the same relation to the corporate body which a private agent holds toward his principal. In the strict relation of principal and agent, all the authority of the latter is derived by delegation from the former, and if the power of substitution is not conferred in the appointment, it cannot exist at all. But in corporate bodies the powers of the board of directors are, in a very important sense, original and undvlegated. The stockholders do not confer, nor can they revoke those powers. They are derivative only in the sense of being received from the State in the act of incorporation. The directors convened as a board are the primary possessors of all the powers which the charter confers, and like private principals they may delegate to agents of their own appointment the performance of any acts which they themsdves can perform. The recognition of this principle is absolutely necessary in the affairs of every corporation whose powers are vested in a board of directors. Without it the most ordinary business could not be carried on, and the corporate powers could not.be executed. It is upon this principle, not less than upon the express power contained in the charter to enact bylaws, that the by-law in question, adopted by the Morris Canal and Banking Company, rests. It was, in substance and effect, a regulation which constituted a subordinate agency to conduct the ordinary business of the corporation. The persons composing the agency would change according as the quorum of live or more directors attending the meetings might be constitute d of differuit individuals. But if the board could del :- *217 gate the power of transacting business to five or more individuals named, no doubt exists that the same authority might be imparted to a shifting quorum, composed of the same number.
In the next place, were the arrangements made with the State of Michigan, “ ordinary business," within the meaning of the by-law ? The ordinary business of the corporation had, I think, no limit short of the varied and extensive affairs in which it was authorized by its charter to engage. It could construct and operate a canal, deal in stocks and in trusts, and it could carry on the business of banking in all its departments. If the due execution of these powers did not constitute the ordinary business of the company, then it seems to me impossible to suggest any definition of those terms, and the by-law becomes senseless and unmeaning; and if these express powers of the corporation were embraced in the terms of the by-law, it must necessarily follow that the quorum designated took all the incidental authority which the whole board would possess in the execution of the same powers. In the operations of banking, which constituted one portion of the ordinary business, it might become necessary to borrow money and the power to do so existed. (Curtis v. Leavitt, 15 N. Y., 9.) As debts could be created, the incidental power of paying them cannot be doubted. So the condition of the company’s affairs might require a negotiation with creditors and the postponement and securing of their demands. To S' cure a debt and procure its forbearance in a period of embarrassment would not, by any means, be an extraordinary act, in the sense of the by-law, although it might be very unusual in the magnitude and importance of the transaction. In the case before us, if the debt due to the State of Michigan had been much smaller in amount, and the company had pledged only an inconsiderable portion of their assets to secure its payment at a future day, in order to avoid the inconvenience of a present liquidation, no one would claim that such a transaction was extraordinary. But can the validity of such an act depend on the inquiry whether the debt and the security pledged were *218 a small or a large debt and security? If so, then at what sum or value would the transaction cease to belong to the ordinary business of the corporation, and become extraordinary, so as to exclude the authority of the quorum constituted by the bylaw? If this question cannot be answered, as plainly it cannot be, the conclusion would seem to follow that the mere magnitude of the arrangements with Michigan furnish no ground for impeaching their validity. In adopting this conclusion, it is assumed that those arrangements were entered into, not for the purpose of arresting the business of the corporation, but as a means of avoiding present embarrassments, and with the design of facilitating the further and continued prosecution of its ordinary business. That such were the motives which prompted the negotiation seems to have been found as a conclusion of fact by the court from which the present appeal is taken, and the evidence certainly tends to that result.
As already stated, the transfer of securities, including the one in question to Michigan, was made with the previous knowledge of the quorum of directors constituted by the bylaw, and the same quorum subsequently, by a formal resolution, expressly ratified and approved the transaction. Upon that authority, therefore, the transfer rested; and for the reasons which have been given, we think the authority was sufficient.
I incline to the opinion, also, that there is another ground for upholding the transfer as an act of the corporation. A corporation may, like an individual, ratify the acts of its agents done in excess of their authority, and such ratification may, in many cases, be inferred from an informal acquiescence in and approval of those acts. If, on the trial of this case, it had been found that the Morris Canal and Banking Company ratified the transfer in question by the subsequent acquiescence of the board of directors having full knowledge of such transfer, such a conclusion, to say the least, would not have been wholly unsupported by the evidence. The judge who tried the cause without a jury, found nothing on this point. But, as heretofore observed, it was competent for the Superior Court, on *219 reviewing the trial, to examine all the evidence, and to reverse the judgment upon conclusions additional or even hostile to those found at the trial. When we can see that a new trial has been granted on such grounds, and even when we are unable to learn from the case that such were not, and ought not to have been, the grounds of the decision, we should not, on appeal to this court, reverse the order. To do so would involve an examination of questions of fact purely, and an estimate of the weight and value of the testimony. Upon such investigations we do not enter. In this case, on examining the reasons of the court below for awarding a new trial, we find the acquiescence of the company, during a period of several months before its failure, in the transfer to Michigan, and a ratification of that act inferred from such acquiescence, stated as one of the grounds for upholding the transaction; and as the evidence undoubtedly tends in a greater or less degree to sustain this conclusion, we must assume it to be well founded.
On the hearing of the present motion for a reargument, it has been urged that the issue contained in the pleadings presented for trial no question of subsequent ratification of the dealing with Michigan, but was confined to a previous or cotemporaneous authority, derived from the corporation; and on this ground it has been insisted that the evidence of ratification must be entirely disregarded in this court, as it should have been in the court below. We cannot adopt this view. The ratification by a principal of an unauthorized act of an agent has a retroactive efficacy, and being equivalent to. an original authority, we think that an allegation of due authority is sustained by proof of such ratification.
On the first branch of the case, therefore, we arrive at the conclusion that the court below did not err in holding that the transfer of the security in question to the State of Michigan was valid and effectual as against the Morris Canal and Banking Company. The remaining question is, whether the plaintiff, deriving his ’ title through proceedings in a creditor’s suit against that company, can impeach such transfer under the *220 New Jersey statute above mentioned, “ to prevent frauds by incorporated companies.”
The 2d section of that statute declares, “ That whenever any such incorporated company shall hereafter become insolvent, or shall suspend the ordinary business of the said company for want of funds to carry on the same, it shall not be lawful for the directors or managers of the said company, or for any officer or agent of the said company, to sell, convey, assign or transfer any of the estate, effects, choses in action, goods, chattels, rights or credits, lands or tenements of the said company; nor shall it be lawful to make any such sale, conveyance, assignment or transfer in contemplation of the insolvency of any such company, and every such sale, conveyance, assignment or transfer shall be utterly null and void as against creditors; provided, always, that in case of a bona fide purchase, made for a valuable consideration, before the said company shall have actually suspended the ordinary business of the said company as aforesaid, by any person having no knowledge, information or notice of the insolvency of the said company, or of the sale being made in contemplation of the insolvency of the said company, such purchase shall not be invalidated or impeached.”
The 6th section of the act gives to the Chancellor of New Jersey the power to restrain insolvent corporations from exercising any of their franchises, and from paying out or transferring any of their assets. The 8th section authorizes the Court of Chancery to appoint receivers or trustees, with full power to collect, take possession of, and to sell and assign the estate owned by the corporation at the time of its insolvency.
As before mentioned, the Morris Canal and Banking Company was proceeded against, by creditors under this statute, in the year 1841. Receivers were appointed in January, 1842, who, in 1845, transferred the claim in question, as well as other claims, to the plaintiff’s immediate assignor, who, it seems, took such transfer in trust for him. Mr. Justice Hoffman, in determining the present case in the plaintiff’s f ivor at the trial, found as a fact that the company was insolvent before *221 and on the 9th of December, 1840, the date of the transfer to the State of Michigan; and he also found that the State had notice of such insolvency. The Superior Court, in reviewing his decision, appears to have arrived at different conclusions on both these points. So far as the solvency is concerned these opposing conclusions were founded on different constructions of that term; it being the opinion of the court of review that a corporation was insolvent,- within the meaning of the statute, only on a suspension of its ordinary business and payments, and not on the mere ground that the value of its assets was less than the amount of its debts. In respect to the notice which it is alleged the State had, there was scarcely a conflict in the evidence, but the opposite results arrived at proceeded on different views and constructions placed upon that evidence. We do not now discuss these matters, being of opinion that the decision which we make will rest- more firmly on other grounds yet to be examined.
Assuming that the title of Michigan,' although good, as we have seen, against the corporation, might be defective as to creditors under the statute referred to, the next inquiry is, whether Mr. Thompson was a purchaser in good faith. To be entitled to claim in that character he must not only have paid value, but he must have dealt in ignorance of the facts and circumstances which rendered the title of his assignor, the State, assailable by the creditors of the Morris Company. That he paid the sum of $20,000 for this security, at a public sale, is not denied. On the question of notice to him of the alleged imperfection in the title, the finding at the trial is quite inconclusive. Without imputing notice in terms, or conceding good faith, this finding states “ that a copy of the agreement of December 9th, 1840, between the company and Michigan, was exhibited to Mr. Thompson; that he was informed that the State sold only what right it possessed and would not guarantee the solvency of the company or the title; and that the papers connected with the claim of the State were examined by Thompson or his attorneys and agents.” The Superior Court, in awarding a new trial, appears to have *222 been very clearly of opinion that Thompson bought without notice, and was entitled to all the rights of a Iona fide purchaser. We have looked at the evidence on this point, and having done so, we cannot say that the conclusion of the court below is unfounded. The exhibition to Thompson of the agreement of December 9, 1840, simply informed him that the company had made a written sale, free from all objection on its face, of this security and others to the State of Michigan. The circumstance that the State, in making a public sale of assets derived from one of its debtors, refused to enter into guarantees is entitled to very little weight, as notice of defects in its title. And in respect to “papers connected with the claim,” I see no evidence that any written or printed document was exhibited to Thompson which would impart the knowledge or information imputed to him. A discussion of the evidence delivered on this branch of the case would be inappropriate. The conclusion of the court whose decision we are reviewing is not unsupported; and, therefore, we are not at liberty to reject it.
It is proper, however, to observe in this connection, that upon this question of notice and good faith, the statute of Mew Jersey is to be regarded as one of the facts of the case, which, like any other fact material to that question, must be brought home to the knowledge of the purchaser. There is no doubt that all persons dealing with or deriving title from a foreign corporation are bound to take notice of every limitation upon its powers contained in its charter. The question of corporate power must of necessity enter into all such dealings. But other laws of a general nature enacted by a foreign State, although tending to abridge or modify those powers, fall within the well settled rule, that where knowledge of a foreign law is material upon a question of good faith, such knowledge must be shown. This rule must be applied to the case before us.. Thompson was a citizen of Mew York, and purchased the bond and mortgage in controversy within this State. As his title rested upon the assignment of the Morris Company to the State of Michigan, it would be defective if *223 the assignment was forbidden by the charter of that company. But the statute of 1829 related to all the corporations in the State of New Jersey. It was substantially an insolvent law applicable to those bodies, and having no extra-territorial force, notice of its existence must be brought home to a party in another State where such notice is a material fact.
It has been suggested on the argument that the answer of Thompson’s executor does not deny that his testator had notice, at or before the time when he paid the purchase money to the State of Michigan. It appears that the security in question was struck off at auction on the 2Íth of May, 1843, but was not assigned and delivered by the agent of the State, nor was the $20,000 paid, until the 30th of the same month. Now the answer, after setting forth these facts, denies, in terms quite explicit, that Thompson, “when he purchased the said debt and securities as aforesaid,” knew or had any information of the matters charged in the bill to have been within his knowledge. The purchase was not complete until the security was assigned and the purchase money paid; and the answer, upon a fair construction, must be deemed to include, in the denial of notice, not merely the sale at the auction, but the time when the acts were done in completion of that sale.
Another suggestion on this point of notice may deserve a passing remark. It appears that by a verbal understanding one George Griswold had a joint interest with Thompson in the purchase of the security, which, however, he afterwards released. On the argument it was said that he was also one of the agents of Michigan in making the sale, and on this ground it was claimed that notice of all defects in the title should be imputed both to Thompson and Griswold. The fact of Griswold’s agency for the State was not found at the trial, nor has it been noticed in either of the subordinate courts. On looking into the evidence, I do not find that he sustained any such relation to the State as will justify the conclusion attempted to be drawn, even if we were to assume that the State itself had notice of the alleged imperfection in title, which is now under consideration.
*224 The State of Michigan, therefore, having had an assignment of this security, valid as against the Morris Canal and Banking Company, and Mr. Thompson having acquired it from that State for value, and without notice of the facts which might render the title voidable as to creditors under the New Jersey insolvent corporation law, it becomes now material to observe that his title thus acquired does not depend for its validity upon any principle of comity due from the courts of this State to the laws of another State. The assignment to Michigan was a voluntary one, made by a corporation which, being unrestricted in its charter, had all the capacity of a private person to sell or pledge the security in question. It was an assignment, therefore, valid everywhere; because a voluntary conveyance of personal estate, good by the law of the place where it is made, passes the title wheresoever the estate may be situated. Its validity here depended, not on the extraterritorial force of any local law of New Jersey, but on the jus disponendi possessed by the artificial person which executed the transfer. (Story’s Conf. of Laws, §§ 383, 384, and eases cited in notes; Hoyt v. Thompson, 1 Seld., 352, per Paige, J.) The rule stated is, perhaps, to be taken with the qualification that the transfer is not in opposition to the law of the place where the property is situated; but that qualification cannot affect the present question, because the assignment of the corporation to the State of Michigan was not wanting in any requisite essential to its validity under onr own laws.
But on the other hand, the plaintiff, having no claim to this security which he can trace to the voluntary act or conveyance of its former owner, the company, is compelled to invoke the principle of comity in order to impeach the legal title which Thompson thus acquired. He claims purely by force of a statute of another State, and under an assignment, not from the owner, but effectuated by the operation of that statute alone. It needs no argument to show that such an assignment is of no validity in this State, and we have only to consider what effect is to be given to it on the principles of interstate comity. When the case was before this court on a *225 former occasion (1 Seld., 320), it was held, on the allegations of the bill admitted by the demurrer, that neither the State of Michigan nor Thompson acquired any title, because' the assignment by the officers of the company to the State was not the act of the corporation, and was, therefore, wholly void. That conclusion being reached, Chief Justice Ruggles then stated the question to be, whether the plaintiff’s title, derived in the manner which has been stated, “ was to be recognized by the courts of this State as so far valid ” that the security might be enforced against the Long Island Railroad Company. -In overruling’ the demurrer, the court was careful to lay down no doctrines not essential to the solution of that precise question. Chief Justice Ruggles observed: “ It is a conceded principle that the laws of a State have no force, proprio vigore, beyond its territorial limits. But the laws of one State are frequently permitted, by the courtesy of another, to operate in the latter for the promotion of justice, where neither that State nor its citizens will suffer any inconvenience from the application of the foreign law.” Paige, J., said: “The statutes and laws of a country have no intrinsic extra-territorial force. They bind only its own citizens and citizens of other countries while-within its jurisdictional limits, and they bind directly only property within those limits. They do not affect or bind property out of its territory, or persons not resident therein. Whatever, extra-territorial force those statutes and laws are permitted to have is the result of the voluntary consent of other nations. This consent is accorded upon the principle of the comity of nations alone, and not from any international obligation to yield to such statutes and laws the slightest obedience. But no nation, on any recognized principles of comity, is morally or otherwise bound to enforce foreign laws prejudicial to its own rights or the rights of its citizens.” The doctrines thus perspicuously stated, furnish no aid to the plaintiff in the circumstances of the case as they are now assumed to be. We adjudge that the title of Michigan was valid against the New Jersey corporation, and that Thompson acquired the same title with the possession of the security *226 as a derivative purchaser in good faith. To divest his rights, as we are asked to do, would be to concede to the insolvent law of another State the positive obligation and force which it would have if enacted in this State. Ho case has ever gone to this extent, or suggested a principle on which this can be done. For the purposes of such a question the States of the Union are to be deemed as foreign to each other. The comity which is due to a sister State may require, as this court held, that the assignee of an insolvent person or corporation in that State should be allowed to sue a debtor here; but neither justice nor comity demands that the foreign law should be recognized to the extent of divesting the titles of our own citizens fairly acquired.
On this ground we prefer to rest our own conclusion. The saving clause in the Hew Jersey statute, in favor of Iona,fide purchasers, would seem, by its terms, to apply only to immediate purchasers from the corporation. It may be that a derivative purchaser, having no knowledge of a defect, such as is alleged to exist in this case, in the title of his assignor, would be protected on some general rule of equity. But we do not think it necessary to examine that question.
On the whole, having reexamined the case, we are satisfied, for the reasons stated, that there is no error or misapprehension in the decision already pronounced. The motion for a reargument must, therefore, be denied, with costs.
: Johnson, Ch. J., and Strong, J., took no part in the decision; Selden, J., dissented.
All the other judges concurring,
Motion denied.